**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

WILBERN COOPER,

               Petitioner,              Case Number: 2:15-10679
                                              HONORABLE SEAN F. COX

v.

MARY BERGHUIS,

               Respondent.
_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY, IN PART

Petitioner Wilbern Cooper seeks habeas corpus relief under 28 U.S.C. § 2254. Petitioner is a state prisoner in the custody of the Michigan Department of Corrections pursuant to a felony-murder conviction. He seeks relief on the ground that his Fifth Amendment rights were violated by the admission of his custodial statements. Respondent argues that Petitioner's challenge to the admission of one of his custodial statements is procedurally defaulted and that all of the custodial statements were properly admitted. For the reasons set forth below, the Court denies the petition and grants a certificate of appealability, in part.

## I.    Background

Petitioner's conviction arises from the murder of David McKillop. McKillop was shot multiple times in a home he shared with Paul Robert Jenkins. It was the prosecutor's theory that Jenkins was the intended target and that Petitioner had gone to Jenkins' home at the

direction of Petitioner's roommate, John Anderson. Jenkins purportedly owed a large sum of money to Anderson for drugs and Petitioner and some associates were directed to go to Jenkins' home to encourage him to repay the debt. The Michigan Court of Appeals provided this overview of the circumstances leading to Petitioner's conviction:

> The victim was murdered in September of 1978. His body was discovered by his roommate, Paul Jenkins, who was not home during the murder. The victim was lying in a pool of blood in his bedroom with his hands tied behind his back with an electrical cord. He was shot seven times in the head, and sustained an injury to his groin. A pillow was discovered next to the victim's body and was riddled with bullet holes, residue, burns, and blood.

> While the police conducted an initial investigation in 1978, they did not discover any evidence of a forced entry or ransacking. The police interviewed Jenkins, who informed them that the victim was involved in a cult and was probably murdered for having sex with married women. Jenkins allegedly owed a debt to John Anderson, defendant's roommate, although Jenkins denied this at the time of trial. The police also interviewed Billy Lolley. Lolley had encountered the victim either the day of the murder or the day before, as the victim worked at a real estate agency owned by Jenkins, and the victim had shown Lolley a house. While the detectives pursued several leads, they cleared all of their suspects without discovering who killed the victim.

> In November of 2006, however, Lolley contacted the Farmington Hills Police Department about the murder, seeking to clear his conscience. Lolley told the police that someone had offered defendant $3,000 to kill a man and defendant, in turn, offered Lolley $1,500 to be the driver. Lolley refused the offer, thinking that defendant may have been joking. Yet, after the murder, defendant told Lolley that he had killed the victim. Defendant explained that he laid the victim down on the floor, put a pillow on his head, and shot him repeatedly in the head. Defendant confessed to Lolley that they had meant to kill Jenkins but had accidently killed the victim. Anderson warned Lolley to keep quiet or they would kill Lolley or his children.

> The police interviewed defendant several times, and defendant's statements were admitted at trial.

*People v. Cooper*, No. 304610, 2013 WL 2223896 (Mich. Ct. App. May 21, 2013).

Following a jury trial in Oakland County Circuit Court, Petitioner was convicted of first-degree felony murder and second-degree murder. The second-degree murder count was vacated on double jeopardy grounds. On June 1, 2011, he was sentenced to life imprisonment for felony murder. Petitioner filed an appeal of right in the Michigan Court of Appeals, raising several claims, including the claim raised in this petition. The Michigan Court of Appeals affirmed Petitioner's conviction. *Id.* The Michigan Supreme Court denied Petitioner's subsequent application for leave to appeal. *People v. Cooper*, 495 Mich. 900 (2013).

Petitioner then filed the pending habeas corpus petition through counsel. He raises this claim:

> The trial court violated Mr. Cooper's constitutional rights by admitting into evidence statements obtained where police questioned appellant after he unambiguously invoked his Fifth Amendment right to remain silent; any statements made thereafter were involuntary and should have been suppressed.

Respondent has filed an answer in opposition, arguing that portions of this claim are procedurally defaulted and that the entire claim is without merit.

## II.    Standard

Review of this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, a state prisoner is entitled to a writ of habeas corpus only if he can show that the state court's adjudication of his claims –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 408. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997)); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102.  Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Id.*

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" Supreme Court precedent. *Id.*  Indeed, "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.*  (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979)) (Stevens, J., concurring)).  Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

Additionally, a state court's factual determinations are entitled to a presumption of correctness on federal habeas review. *See* 28 U.S.C. § 2254(e)(1).  A petitioner may rebut this presumption with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358,

360-61 (6th Cir. 1998).  Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III.    Discussion

Over 32 years after David McKillop's murder, Petitioner was convicted of first-degree felony murder and sentenced to life imprisonment.  Petitioner argues that his custodial statements were improperly admitted because his assertion of his right to silence was not scrupulously honored.  Alternatively, he argues that his custodial statements were not voluntarily made.  Petitioner further contends that the admission of these statements was not harmless error.

Police interviewed Petitioner twice before his arrest, once in December 2006, and once in January 2010.  Police interviewed Petitioner three times after arresting him on March 2, 2010.  Two of these interviews occurred on March 2, 2010, and one occurred the following day, March 3, 2010.  Petitioner challenges the admission of the second March 2nd interview and the March 3rd interview.  The Court finds that Petitioner clearly and unambiguously invoked his right to remain silent during the second March 2nd interview and that admission of the portion of the interview following invocation of this right violated Petitioner's constitutional right to remain silent.  The state court's finding that this error was harmless is not contrary to or an unreasonable application of Supreme Court precedent.  The Court further finds that Petitioner's challenge to the March 3rd interview is procedurally defaulted.

### A.    Non-Custodial Interviews

#### 1.    December 2006 Interview

In 2006, Farmington Hills Police Department detective Richard Wehby and his partner, Detective Scott Rzeppa, were working with the department's cold case team, when they received a call from Bill Lolley regarding a murder which occurred in 1978. Lolley identified the killer as Petitioner. The detectives determined that Lolley was referring to the murder of David McKillop. Detective Wehby and another detective interviewed Petitioner in December 2006. Petitioner was not under arrest at the time. Detective Wehby characterized Petitioner as cooperative and talkative. Petitioner described his relationship with John Anderson, a drug dealer who allowed Petitioner to live in his basement when Petitioner was 17-years old. Anderson was like a father-figure to Petitioner, but also allowed Petitioner to be a fall guy when police investigated Anderson's illegal activities. Petitioner knew Lolley from the neighborhood. He and Petitioner would occasionally socialize. Detective Wehby testified that when he asked Petitioner about Robert Jenkins, Petitioner seemed nervous and his face flushed. Detective Wehby informed Petitioner that police had information that Petitioner had been paid to kill someone, but that he killed the wrong person. In response, Petitioner changed the subject. Petitioner ultimately denied ever killing anyone for money, but did not deny having killed someone.

During the interview, Petitioner agreed to provide a DNA sample, but, by the end of the interview, he declined to do so. Detective Wehby also testified that Petitioner took measures during the interview which Detective Wehby interpreted as Petitioner avoiding leaving behind any traces of DNA evidence. For example, Petitioner smoked five cigarettes during the course of the interview, stepping outside with detectives each time to do so.

7

Petitioner never discarded his cigarettes in the receptacles outside the police station. He instead placed the paper and filter into his pocket. When he was finished drinking his coffee, he broke the styrofoam cup into pieces and placed the pieces in his pocket. Also, instead of discarding his chewing gum into a garbage can, he placed the gum into a piece of the styrofoam cup and placed the garbage in his pocket. When Petitioner advised the detectives that he wanted to end the interview, the detectives ended the interview.

### 2. January 26, 2010 Interview

Approximately three years later, on January 26, 2010, Detectives Wehby and Rzeppa interviewed Petitioner at the car dealership where Petitioner worked. Detective Wehby testified that the three-year interval between the two interviews was attributable to the continuing investigation, a change in leadership for the prosecutor's office, and "a lot of confusion" regarding caseloads. 5/9/11 Tr. at 12, ECF No. 5-15, Pg. ID 833. The detectives interviewed Petitioner in the manager's office of the car dealership. They advised Petitioner that he could leave at anytime. Detective Wehby told Petitioner that they believed he was McKillop's shooter, but that they believed others were involved as well. Petitioner told Detective Wehby that, if he talked, he would need protection and a grant of immunity from the prosecutor. He also asked Detective Wehby about sentencing guidelines. Petitioner stated that he needed to talk to his wife and prepare her for what was coming, including transferring some properties into her name. Petitioner asked if he could ask the detectives a hypothetical question. While pointing to a picture of John Anderson, Petitioner asked: "[L]et's say John ... put me up to this. I broke into the house. I shoot the guy, is that what

you're saying?" 5/5/11 Tr. at 164, ECF No. 5-13, Pg. ID 805. Detective Wehby responded

yes, and Petitioner just smiled at him. Detective Wehby also testified that, as he did in his

first interview, Petitioner deposited his coffee cup in his pocket and took his cigarette stub

with him. At the end of the interview, Detective Wehby presented Petitioner with a warrant

for his DNA. Petitioner questioned the authenticity of the warrant, but submitted to the

collection of a sample.

### B.    Custodial Interviews

#### 1.    March 2, 2010, First Interview

Petitioner was arrested by Bay City Police on March 2, 2010, pursuant to a warrant

charging him with open murder. Detectives Wehby and Rzeppa interviewed Petitioner at the

Bay City Police Department. After being advised of his constitutional rights, Petitioner

waived his right to remain silent. His interview with the detectives was recorded and the

DVD played for the jury. Petitioner admitted that he knew some things about the murder,

but denied that he was the shooter. He told the detectives that there were two "incidents"

involved and that the second "incident" was the shooting. The first incident occurred several

days before the murder. Petitioner, Donnie McKinney, and Mark Bollis went to Jenkins'

home at the direction of John Anderson to convince Jenkins to pay a debt owed to Anderson.

No one was home when they arrived, but they entered the home anyway. Petitioner could

not recall whether they picked the lock to enter the home, if the door had been unlocked, or

they entered another way. The men sat in the home's living room for approximately an hour

and a half. As they waited, they discussed a plan to tie Jenkins up, beat him, and deliver the

message that he needed to repay the money he owed. Petitioner found an extension cord in the living room and held onto it so he would be prepared when Jenkins arrived home. He told the detectives that he grabbed the extension cord and "I figured I'd tie him up in a chair ... and then totally beat the shit out of somebody when they can't defend themselves being tied up in a chair." ECF No. 1-5, Pg. ID 141. After waiting for an hour and a half for Jenkins to arrive, the men gave up and left the home.

A few days later, Anderson directed the men to try to speak to Jenkins again. This time, Petitioner, McKinney, Bollis, and a fourth male, whose name Petitioner did not know, went to the home. They sat outside the home for approximately half an hour when a car pulled up. A man exited the car and entered the home. The four men exited the vehicle. McKinney, Bollis, and the unidentified male entered Jenkins' home. Petitioner stated that he waited outside the home on the front porch for a while. He heard arguing from inside the home and then gunfire. Petitioner stated that he left, walking on foot to his home, which was about ten miles away. Petitioner maintained that he did not learn that someone had been killed that night until a couple of years later, but also stated that a few days after the murder, he overheard a conversation between Terry Beck and Anderson, during which he Beck told Anderson that they had gotten the wrong guy. Petitioner claimed not to have known that anyone had a weapon when they pulled up outside Jenkins' home. Almost three hours into the interview, Petitioner made the following statement: "See, that's why I don't want to talk to you guys about this because who do I have to collaborate anything I have to say?" ECF No. 1-5, Pg. ID 193. Detectives continued to question Petitioner for a short time after this

statement.

## 2. March 2, 2010, Second Interview

Petitioner was transported to the Farmington Hills Police Department and again interviewed by Detectives Wehby and Rzeppa.[1] The interview commenced at approximately 10:30 p.m. Detective Wehby reminded Petitioner that the *Miranda* form Petitioner signed earlier was still in effect. Petitioner continued to deny that he shot McKillop. He repeated his earlier statement that several days before the murder, he, McKinney, and Bollis went to Jenkins' home to talk to Jenkins about money he owed to Anderson. He also stated that on the night of the murder, he, McKinney, Bollis, and a fourth man went to Jenkins' home. The other three men entered the home when a man they thought was Jenkins arrived home. Petitioner waited outside on the front porch. After a minute, he heard yelling and then several gunshots. Petitioner left the front porch and began a ten-mile trek home. He tried to stay out of sight because he did not want McKinney, Bollis and the third man to see him as they were leaving the home.

Approximately one hour after the interview commenced (at 11:35 p.m.), Petitioner stood up and said, "No, we're done." ECF No. 5-18, Pg. Id 1047. He also twice asked to be taken back to his cell. *Id.* Detective Wehby said, "If you don't wanna talk to us fine, we're

---

[1] Petitioner states that the transcript of the second March 2, 2010 interview is attached as Exhibit E to his petition. It appears to have been omitted from the Court filing. A transcript of the March 2, 2010, interview at the Farmington Hills Police Department was attached as an exhibit to Petitioner's brief on direct appeal to the Michigan Court of Appeals. The Court has reviewed that transcript in place of Exhibit E as it is clear this is the transcript intended as Exhibit E.

gonna stare at you all night." *Id.* Police continued to question him. Ten minutes later, Petitioner said, "I have nothing further to say." *Id.* at Pg. ID 1050 At 11:53 p.m., Petitioner said, "Thank you for your time, I'm not talking anymore." *Id.* at 1051. Police disregarded Petitioner's statement and asked whether he shot and killed McKinnon. Petitioner replied, "No." *Id.* at 1052. Questioning stopped and Petitioner was returned to his cell at approximately 11:54 p.m.

During both of the March 2nd interviews, Detective Wehby referenced DNA evidence. He implied that the DNA evidence might reveal that Petitioner had actually entered the home, rather than waited outside on the front porch as he claim. Detective Wehby testified at trial that they had no DNA evidence linking Petitioner to the crime and that Petitioner's DNA sample was never tested to determine whether it could be linked to a hair that was found at the crime scene.

### 3. March 3, 2010 Interview[2]

Detectives Wehby and Rzeppa interviewed Petitioner again the following morning, March 3, 2010, at approximately 9:00 a.m. Before questioning began, the detectives informed Petitioner that he was still entitled to the rights listed on the *Miranda* form that he signed the previous day. Petitioner initially reiterated his story that he remained on the front

---

[2] Pages 60-62 of this interview transcript are omitted from Petitioner's Appendix F. They are also omitted from the appendix to Petitioner's brief in the Michigan Court of Appeals. These omitted pages are attached to the State's brief on appeal in the Michigan Court of Appeals and the Court has reviewed these pages. *See* ECF No. 5-19, Pg. ID 1270-71.

porch on the night of the shooting. As the interrogation progressed, Petitioner admitted that he entered the house and that he sat on the couch while McKillop struggled with Bollis and an unknown black male. He admitted that he threw Bollis an extension cord to help McKinney tie up McKillop. McKinney pulled a gun out of his jacket. Petitioner told the detectives that McKinney shot McKillop in the head. After a pause, McKinney shot McKillop several more times. Petitioner said he fled after the first few shots were fired.

### C. Assertion of Right to Remain Silent

The Fifth Amendment provides that "[n]o person shall be . . . .compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that, to protect a suspect's Fifth Amendment rights, an individual who has been taken into custody or otherwise deprived of his freedom and is questioned must be advised, prior to any questioning, "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him." *Id.* at 478-79. The Supreme Court has held that if a suspect "indicates in any manner, at any time prior to or during questioning, that he [or she] wishes to remain silent, the interrogation must cease." *Id.* at 473-74. An individual must invoke his right to remain silent unambiguously. *Berghuis v. Thompkins*, 560 U.S. 370, 381-82 (2010) (holding that individual who did not say that "he wanted to remain silent or that he did not want to talk with the police," failed to invoke his right to cut off police questioning). "The admissibility of statements obtained after an individual has invoked his right to remain silent

depends on whether the police 'scrupulously honored' the 'right to cut off questioning.'" *Tremble v. Burt*, 497 Fed. App'x 536, 544 (6th Cir. 2012) (quoting *Michigan v. Mosley*, 423 U.S. 96, 104-05 (1975)).

Petitioner claims that he asserted his Fifth Amendment right to remain silent during both of his March 2nd interviews and during his March 3rd interview, that police did not "scrupulously honor[]" his right to cut off questioning, and that statements from all three interviews should have been excluded.

            1.       The First March 2nd Interview

Petitioner was arrested on March 2, 2010 in Bay City, pursuant to a warrant charging him with open murder. After being advised of his *Miranda* rights, Petitioner was questioned by Detectives Wehby and Rzeppa. More than three-quarters into this interview, the following exchange occurred:

| | |
|---|---|
| Det. Wehby: | We don't have a weapon. I'm telling ya we don't have a weapon. The only way I can prove who shot and killed him is if somebody tells me they shot and killed him. |
| Petitioner: | See, that's why I don't want to talk to you guys about this because who do I have to collaborate anything I have to say? |

ECF No. 1-5, Pg. ID 193.

Petitioner argues that this statement amounted to an unambiguous assertion of his right to remain silent. The Michigan Court of Appeals rejected this argument. After citing the correct constitutional standard, the state court held: "While defendant indicated his preference was not to speak with the police unless someone could corroborate his statements,

14

a preference is not an unequivocal or unambiguous assertion of the right to remain silent." *Cooper*, 2013 WL 2223896 at *2. Petitioner's statement did not clearly indicate a desire to cease questioning. The state court's conclusion, therefore, is not an unreasonable application of Supreme Court precedent.

### 2. The Second March 2nd Interview

Detectives Wehby and Rezzpa interviewed Petitioner a second time on March 2nd. This interview occurred after Petitioner was transported from the Bay City Police Department to the Farmington Hills Police Department. Petitioner maintains that, during this interview, he also invoked his right to remain silent. Approximately one hour after the interview commenced, Petitioner stood up and said, "No, we're done." (ECF No. 5-18, Pg. Id 1047). Detective continued to question him for approximately eighteen more minutes, during which time Petitioner twice asked to be returned to his cell and twice stated he had nothing further to say. The Michigan Court of Appeals held that Petitioner "unambiguously and unequivocally invoked his right to remain silent." *Cooper*, 2013 WL 2223896 at *2. The Court agrees with the Michigan Court of Appeals' holding that Petitioner's statements constituted a clear and unambiguous assertion of Petitioner's right to remain silent. The Michigan Court of Appeals, however, declined to reverse Petitioner's conviction on this basis because the court held the trial court's failure to suppress the statements from this interview to be harmless beyond a reasonable doubt. *Id.* at *3. The state court reasoned:

> Of significant importance here is that defendant did not make any further admissions after invoking his right to remain silent during this interview. In fact, defendant denied knowing the victim and denied shooting him.

There also was substantial evidence at trial from which a rational jury could find defendant guilty beyond a reasonable doubt absent the error. In an earlier interview in Bay City, defendant admitted to breaking into the house where the victim resided a few days before the murder with the intent to hurt Jenkins, and that he had taken an extension cord from a lamp with the plan of tying up Jenkins. He also admitted that he was on the porch the night of the murder. At trial, Lolley testified that defendant confessed to the killing, admitting that he tied the victim up and "laid him down on the floor[,][p]ut a pillow on his head and shot him in the back of the head. Emptied the gun out." Considering this evidence, any error in admitting evidence of defendant's limited statements after he invoked his right to remain silent was harmless beyond a reasonable doubt.

*Id.*

On federal habeas review, relief may not be granted "based on trial error unless [a petitioner] can establish that it resulted in 'actual prejudice.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). Under this test, relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995). Courts on collateral review must "give a heightened degree of deference to the state court's review of a harmless error decision." *Langford v. Warden*, 665 Fed. App'x 388, 389 (6th Cir. 2016) (citing *Davis v. Ayala*, 576 U.S. —, 135 S. Ct. 2187, 2197 (2015)).

Although detectives continued to question Petitioner for 18 minutes after he invoked his right to remain silent during the second March 2nd interview, the Michigan Court of Appeals accurately concluded that Petitioner said little of substance after invoking his right to remain silent. Petitioner did not give an incriminating statement after invoking his right

to remain silent and nothing he said contradicted or supplemented any of his previous statements.  Thus, the admission of the portion of the second March 2nd interview following Petitioner's assertion of his right to remain silent did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623.

### 3.   The March 3rd Interview

Finally, Petitioner challenges the trial court's failure to suppress his March 3rd interview.  Respondent argues that Petitioner's challenge to the admissibility of this statement is procedurally defaulted.  The Court finds that the claim is procedurally defaulted and that Petitioner has not alleged cause and prejudice to excuse the default, nor has he shown that failure to consider the claim would work a manifest injustice.

Federal habeas relief is precluded on claims that were not presented to the state courts in accordance with the state's procedural rules.  *See Wainwright v. Sykes*, 433 U.S. 72, 85-87, (1977).  The doctrine of procedural default is applicable when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "independent of the federal question and adequate to support the judgment."  *Walker v. Martin*, 562 U.S. 307, 315 (2011) (internal quotations omitted). Federal courts on habeas review must decide whether a state procedural bar is adequate. That is, the "'adequacy of state procedural bars' ... is not within the State's prerogative finally to decide; rather, adequacy 'is itself a federal question.'"  *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quoting *Douglas v. Alabama,* 380 U.S. 415, 422 (1965)).  "[O]rdinarily, violation of 'firmly established and  regularly followed' state rules ... will be adequate to

foreclose review of a federal claim," but there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." *Id.* at 376.

The Michigan Court of Appeals expressly relied on the invited-error doctrine in declining to review the admission of Petitioner's March 3rd interview:

> This issue has been waived. Waiver is the intentional relinquishment of a known right that extinguishes any error and precludes appellate review. *People v. Carter*, 462 Mich. 206, 215; 612 N.W.2d 144 (2000).
>
> In the direct examination of Detective Richard Wehby, the prosecution did not ask about the March 3rd interview. During cross-examination, however, defense counsel initiated a line of questioning regarding the detective's false representations to defendant about DNA evidence during the March 2nd interview at Bay City. The following colloquy ensued:
>
> > Q.   Okay. And you did that in order to try to get him to admit something that he didn't do.
> >
> > A.   I was trying to get him to open up further about his involvement in the incident, yes.
> >
> > Q.   He never did that, did he?
> >
> > A.   *No, as a matter of fact he did.*
> >
> > Q.   He never told you he was inside when you had this interview, did he?
> >
> > A.   Did he ever tell me that he was inside?
> >
> > Q.   No, I said during this interview did he tell you he was inside?
> >
> > A.   No, sir not during that interview he didn't tell me. [Emphasis supplied by Michigan Court of Appeals.]

18

On redirect, the prosecution then asked if defendant ever indicated that he was inside the house, to which the detective replied: "Yes, he did." The prosecution asked if that admission occurred during the March 3rd interview, to which the detective replied in the affirmative and explained that it was in that interview that defendant changed his story, admitted to entering the house, and admitted to providing the extension cord to tie the victim up and helping to subdue the victim. Defense counsel then requested that the transcript of the March 3rd interview be provided to the jury and that all of the taped interviews be played for the jury.

Thus, it was defendant's questioning of Detective Wehby that resulted in the reference to the March 3rd interview and it was defendant who subsequently moved to admit that interview at trial. Defendant made a strategic choice when attempting to impeach Detective Wehby. Defendant then made a second strategic choice in introducing the videotape of this interview in an effort to show the jury the apparent coerciveness of the police. These strategic choices were ultimately unsuccessful, and defendant now objects to the admissibility of the March 3rd interview. Yet, "[a]ppellate review is precluded because when a party invites the error, he waives his right to seek appellate review, and any error is extinguished." *People v. Jones*, 468 Mich. 345, 352 n. 6; 662 NW2d 376 (2003).

*Cooper*, 2013 WL 2223896 at *3.

Under the doctrine of invited error, a party waives the right to seek appellate review when the party's own conduct directly caused the error. *People v. McPherson*, 263 Mich. App. 124, 139 (Mich. Ct. App. July 20, 2004) (*citing People v. Jones*, 468 Mich. 345, 352 (Mich. 2003)). The Sixth Circuit in *Fields v. Bagley*, 275 F.3d 478 (6th Cir. 2001) explained invited error as "a branch of the doctrine of waiver in which courts prevent a party from inducing an erroneous ruling and later seeking to profit from the legal consequences of having the ruling set aside." *Id.* at 485-86 (citing *Harvis v. Roadway Express, Inc.*, 923 F.2d 59, 61 (6th Cir. 1991)). Further, "[w]hen a petitioner invites an error in the trial court, he is precluded from seeking habeas corpus relief for that error." *Id.* at 486 (citing *Leverett v.*

*Spears*, 877 F.2d 921, 924 (11th Cir. 1989)); *Draughn v. Jabe*, 803 F.Supp. 70, 75 (E.D. Mich. 1992). This doctrine has been found to be long-established and regularly followed in Michigan. *Pattereson v. Curtin*, No. 1:13-cv-503, 2016 WL 4150730, *15 (W.D. Mich. Aug. 4, 2016); *see also Antoine v. Mackie*, No. 14-14933, 2015 WL 6671570, *5, n.2 (E.D. Mich. Nov. 2, 2015) (finding that Michigan Court of Appeals' reliance on invited error doctrine constituted procedural default of claim); *People v. Whetstone*, 326 N.W.2d 552, 554 (Mich. Ct. App. Sept. 21, 1981) (finding that under the invited error doctrine a party waives review of the issue on appeal).

Prior to defense counsel's cross-examination of Detective Wehby, a discussion was held outside the presence of the jury regarding the March 3rd interview. The prosecutor clearly indicated his intention was to introduce portions of the March 3rd interview *only* as necessary to impeach Petitioner if he testified. Petitioner argues that counsel's questions to Detective Wehby regarding whether Petitioner ever admitted to being inside the house during the first March 2nd interview were narrowly crafted to address only Detective Wehby's statements regarding (non-existent) incriminating DNA evidence. The Michigan Court of Appeals held that the questions were not narrowly tailored to this specific topic. The Court finds that this is a reasonable interpretation of the record. The Michigan Court of Appeals' reliance on invited error to bar consideration of Petitioner's challenge to the March 3rd interview was not an exorbitant application of the rule. It was, instead, enforcement of a firmly established and regularly followed procedural rule.

Petitioner's challenge to the March 3rd interview is thus procedurally defaulted unless

Petitioner shows cause for the default and actual prejudice that resulted from the alleged violation of federal law or that there will be a fundamental miscarriage of justice if the claims are not considered. *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991). Petitioner neither alleges nor establishes cause to excuse his default. The Court need not address the issue of prejudice when a petitioner fails to establish cause to excuse a procedural default. *See Smith v. Murray*, 477 U.S. 527, 533 (1986); *Long v. McKeen*, 722 F.2d 286, 289 (6th Cir. 1983).

Additionally, Petitioner has not established that a fundamental miscarriage of justice has occurred. The miscarriage of justice exception requires a showing that a constitutional violation probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 624 (1998). "To be credible, [a claim of actual innocence] requires petitioner to support his [or her] allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. Petitioner has made no such showing. This claim, therefore, is procedurally defaulted.

### D.      Voluntariness of Statements

Finally, Petitioner argues that his custodial statements were involuntary because his will was overborne by the conduct of the police. The Michigan Court of Appeals held the statements, under the totality of the circumstances, were voluntarily made:

Defendant's statements were voluntary. Defendant was 49 years old at the

time of the police interviews, he had a criminal background and experience with the criminal justice system, he boasted to the police that he was a self-professed fan of cold case television programming, and his actions indicated he was very familiar with DNA testing. At the beginning of the custodial Bay City interview, defendant was read his Miranda rights and explicitly waived those rights. There is no evidence that anyone threatened or abused defendant. While the interviews were not short, defendant does not claim that he was injured, intoxicated, drugged, or denied food, sleep, or medical attention. He did not display any behavior suggesting that he failed to comprehend the questions being asked of him. Therefore, under the totality of the circumstance, we find that the confession was freely and voluntarily made.

*Cooper*, 2013 WL 2223896 at *4.

The Fifth Amendment privilege against compulsory self-incrimination bars the admission of involuntary confessions. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). A confession is considered involuntary if: (1) the police extorted the confession by means of coercive activity; (2) the coercion in question was sufficient to overbear the will of the accused; and (3) the will of the accused was in fact overborne "because of the coercive police activity in question." *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988). In determining whether a confession is voluntary, the ultimate question is "whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution." *Miller v. Fenton*, 474 U.S. 104, 112 (1985). Without coercive police activity, however, a confession should not be deemed involuntary. *Connelly*, 479 U.S. at 167 ("coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause"). The burden of proving that a confession was given involuntarily rests with the petitioner. *Boles v. Foltz*,

816 F.2d 1132, 1136 (6th Cir. 1987). Voluntariness need only be established by a preponderance of the evidence. *Id*. On federal habeas review, a federal court must presume that the state court's factual finding that a defendant fully understood what was being said and asked of him was correct, unless the petitioner shows otherwise by clear and convincing evidence. *Williams v. Jones*, 117 Fed. App'x 406, 412 (6th Cir. 2004).

The Michigan Court of Appeals applied a totality of the circumstances approach when evaluating Petitioner's claim, and, in so doing, it did not fail to adequately consider relevant factors. Based upon the totality of the circumstances in this case, it was objectively reasonable for the Michigan Court of Appeals to hold that Petitioner's confession was voluntary. *See McCalvin v. Yukins*, 444 F.3d 713, 720 (6th Cir. 2006). Accordingly, the Court denies this claim.

## IV. Certificate of Appealability

In order to appeal the Court's decision, Petitioner must obtain a certificate of appealability. To obtain a certificate of appealability, Petitioner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, Petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. §

2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997). Here, jurists of reason could debate the Court's holding regarding Petitioner's challenge to the admissibility of the March 3, 2010 interview. Therefore, the Court grants Petitioner a certificate of appealability limited to that issue. The Court finds that reasonable jurists would not debate the Court's conclusions with respect to the challenges to the admission of both of the March 2, 2010 interviews and denies a certificate of appealability as to the remaining claims.

**V.      Conclusion**

For the reasons stated above, the Court DENIES the petition for a writ of habeas corpus. The Court GRANTS a certificate of appealability limited to Petitioner's challenge to the March 3, 2010 interview and DENIES a certificate of appealability with respect to the remaining claims.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  March 8, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 8, 2018, by electronic and/or ordinary mail.

s/Jennifer McCoy
Case Manager